JOURNAL ENTRY AND OPINION
Defendant-appellant, Courtney Laing, appeals his conviction in the Cuyahoga County Court of Common Pleas for drug trafficking, in violation of R.C. 2925.03. For the reasons set forth below, we reverse.
On August 28, 1997, a Cuyahoga County Grand Jury indicted appellant and three co-defendants — Marilyn Lysius, James Guy and Elaine Rankine — for trafficking in marijuana, in an amount exceeding five thousand grams but less than twenty thousand grams, in violation of R.C. 2925.03. Appellant, Guy and Rankine were also indicted for kidnapping a child under the age of thirteen years, in violation of R.C. 2905.01, and for extortion, in violation of R.C. 2905.11. Lysius was also indicted for child endangering, in violation of R.C. 2919.22.
On September 25, 1997, Lysius pled guilty to misdemeanor child endangering and to a felony of the fourth degree drug trafficking charge and agreed to testify at her co-defendants' trial.
Trial commenced on November 3, 1997 against appellant, Rankine and Guy. The jury found appellant and Rankine not guilty of the kidnapping and extortion charges, but hung as to the drug trafficking charge against them. The jury found Guy guilty of drug trafficking and extortion, but hung on the kidnapping charge.
On December 4, 1997, the state again proceeded to trial against appellant and Rankine on the drug trafficking charge.
Before beginning the trial, the trial judge told appellant and Rankine that if they pled guilty, he would sentence them to eighteen months in prison with credit for time served, but if they went to trial and were found guilty, he would sentence them to five years. The trial judge stated, "You don't have to take the plea. You can take it to the box. If you get convicted, I'll give you five years. It's either win it all or lose it all." Neither appellant nor Rankine accepted the plea and the case proceeded to trial.
Marilyn Lysius testified for the state that she was living in Philadelphia in July of 1997. Sometime near the end of July she was approached by an acquaintance who asked her if she would do a favor for "Tony." The acquaintance told Lysius that Tony would pay her $1200 to $1300 to fly from Cleveland to Los Angeles to pick up a suitcase and bring it back to Cleveland.
Along with her four-year-old son, Kymahli, Lysius took a bus to Cleveland. Tony met Lysius and Kymahli at the Greyhound bus station in Cleveland and took them to the North Point Inn, which abuts the bus terminal. After purchasing a plane ticket to Los Angeles for Lysius, Tony took Lysius and Kymahli to the airport. According to Lysius, Tony informed her at the airport that she could not take Kymahli with her, but that he would watch him.
Following Tony's instructions, Lysius met with a woman in Los Angeles who gave Lysius a floral suitcase, tagged with the name "Marsha James," and then sent her to a Greyhound bus station to catch a bus for the return trip to Cleveland. Lysius testified that Greyhound baggage handlers took the floral suitcase from her before she boarded the bus and stowed it in the luggage carrier of the bus.
According to Lysius, the bus broke down once and she had to change buses several times during the two-day trip to Cleveland. Lysius testified that Tony was waiting for her upon her arrival at approximately 7 a.m. on August 4, 1997 at the Greyhound bus station in Cleveland. When Lysius attempted to retrieve the floral suitcase, however, it could not be located.
Upon learning that the bag could not be located, Tony paid for a room for Lysius at the North Point Inn, and then took her to a check-cashing store to obtain a false identification card, with the name "Marsha James" on it, in case she would later need identification to retrieve the bag. Tony then dropped Lysius off at the North Point Inn, with instructions to find the bag.
Lysius testified that Kymahli was not with Tony when he met her at the Greyhound bus station. When Lysius asked Tony if she could see Kymahli, Tony told her that all she needed to worry about was his bag, not her son. Lysius testified that when Tony dropped her off at the North Point Inn, he told her, "Remember, you have a son in this."
Lysius then attempted to locate the missing bag. She called various Greyhound terminals along the route from Los Angeles to Cleveland and returned to the Cleveland Greyhound station several times to ask about the bag. Sometime in the evening, a Greyhound supervisor called the Cleveland Police Department for Lysius.
Upon questioning, Lysius told the officers about her arrangement with Tony, her trip to Los Angeles, the missing bag and her concern for the safety of her son. Lysius described the car that Tony drove as a gold Toyota Corolla. Several plainclothes police officers and Lysius then rode around the area, looking for Tony or his car. Unable to locate him, the officers returned Lysius to her hotel room at the North Point Inn.
The next day, law enforcement personnel from various agencies, including the Caribbean Gang Task Force and the Federal Bureau of Investigation, were called in to assist with the investigation. The officers set up undercover surveillance at the North Point Inn in case Tony tried to contact Lysius and put a "trap and trace" on the hotel telephone line so they could trace all incoming calls.
Detective Shelley Patena testified that at approximately 1:00 p.m. on August 5, 1997, she went to the North Point Inn to get a detailed description of the missing bag and to obtain Lysius' consent for the police to open and search the bag if it was eventually found. Along with several other officers, Patena then checked the "Lost Baggage" area at the Greyhound bus station and found the missing suitcase. Upon opening the bag, the officers found a blue comforter covering up four large bricks of marijuana, each wrapped in plastic, with a total weight of 12,025.3 grams.
Tony did not contact Lysius on August 5, 1997. Aware that he might be watching the hotel, however, the officers instructed Lysius to walk across the parking lot of the North Point Inn to the Greyhound bus station to retrieve the bag. She did so and returned to her hotel room to wait, with various law enforcement officers, for a telephone call from Tony.
Sergeant Timothy Patton testified that Tony still had not contacted Lysius by 7:30 a.m. on August 6, 1997, so he ordered an officer to take Lysius to the Justice Center for booking. Shortly after the booking was completed, however, Patton was advised that Tony had attempted to contact Lysius at the hotel. Consequently, Lysius was taken back to the North Point Inn and placed in Room 321. The officers set up a "command post" in the room across the hall from Lysius and installed a tape recorder to tape any telephone calls made to or from Room 321.
Special Agent John Jacobs testified that he obtained Lysius' permission for FBI agents to search her residence in Philadelphia. In the early afternoon of August 6, 1997, the Philadelphia agents advised Jacobs that they had obtained Tony's pager number. The officers then instructed Lysius to page Tony. When Tony returned Lysius' page, he let her speak with Kymahli for a few minutes and then told her that he would call back in ten minutes.
Detective Michael Gray testified that when Tony had not called back after several hours, Lysius paged him again. Tony called Lysius back and told her that he was going to send a woman (later identified as Rankine) to get her. Tony also told Lysius that he would send Kymahli with the woman and that Lysius should give her the bag.
Sergeant Timothy Patton testified that the officers' plan was to follow the woman, after she picked up the bag from Lysius, to her rendevous with Tony. According to Patton, because the officers had replaced the marijuana in the suitcase with telephone books, the officers instructed Lysius not to let the woman open the suitcase in her hotel room. The officers also told Lysius not to leave the hotel room after the woman dropped off the bag.
Lysius testified that when she opened the door to her hotel room, Rankine came into the room and handed over Kymahli, a plastic bag containing some of his things and a bundle of money. According to Lysius, Rankine then started to unzip the floral suitcase. Lysius instructed Rankine not to open the bag in front of her son and then Lysius, Kymahli and Rankine walked to the elevator and got in.
Sergeant Timothy Patton testified that he was disguised as the desk clerk in the lobby of the North Point Inn when he observed a cab pull up to the front door. A woman and a small child got out of the cab, walked past the front desk and got into the lobby elevator. Subsequently, another officer advised Patton that Lysius, Kymahli and Rankine had left the hotel room and were in the elevator. Patton and two other officers stood in front of the elevator and when the doors opened, Patton informed Rankine that she was under arrest. According to Patton, Rankine threw the suitcase at him and started to run down the hallway.
Sergeant Michael Baumiller testified that he caught Rankine, arrested her and then took her upstairs to the command post for questioning. Several other officers took Lysius and Kymahli back to Room 321. Baumiller testified that approximately twenty minutes later, while he was in Room 321 questioning Lysius, he heard a man in the hallway, inquiring where his girlfriend was. Several officers handcuffed the man, later identified as appellant, and took him down to the second floor for questioning.
Detective Dennis Hill testified that Rankine denied knowing appellant. One of the officers interviewing Rankine found a picture of her and appellant in her purse, however. Determining that Rankine and appellant knew each other, the officers arrested appellant.
Detective Michael Gray testified that someone kept paging appellant on his pager while the officers were questioning him. Upon questioning, appellant admitted that the number he was being paged to call belonged to "Rocky." The officers then determined that "Rocky's" telephone number was the same number that Lysius had used to page "Tony" earlier in the day.
According to Sergeant Patton, appellant agreed to cooperate with the police by paging Tony. When appellant paged him, Tony put his telephone number into appellant's pager. When appellant called Tony back, the detectives traced the location of Tony's telephone number to the second story of a duplex located at 10518 Massie in Cleveland. Police officers were immediately dispatched to that location.
Sergeant Baumiller testified that when he arrived at 10518 Massie, he was told by an officer at the scene that he had seen a male matching Tony's description flee from the second story porch into the house. According to Baumiller, the officers searched the house, and eventually found Tony hiding in the basement under the stairwell. The officers subsequently determined that Tony aka Rocky was James Guy.
Upon questioning, Tony admitted that the gold Toyota Corolla in the driveway was his car. Patrolman Dean Graziolli testified that he found twenty plastic bags, each containing one pound of marijuana, in the trunk of the car. The detectives also found a small black suitcase, containing several of Lysius' personal items, in the trunk of the car.
The defense called two witnesses on behalf of appellant and Rankine. David J. Normand testified that he is the owner of an auto body shop in North Olmsted, Ohio and had worked on appellant and Rankine's 1987 Honda Accord several times. Normand testified that appellant and Rankine originally brought the car in to his shop for repair of its computer, but that he could not fix the problem and referred the couple to Ganley Honda. Normand testified further that the car had repeated repair problems and was currently at his shop for further repair.
Elaine Rankine testified that she and appellant bought a Honda Accord from Rocky for $1500. According to Rankine, she and appellant agreed to pay $980.59 to Ganley Honda for repair of the computer in the car, and then pay the balance of the $1500 directly to Guy. Rankine testified that she and appellant made the final payment on the repair bill to Ganley Honda on July 26, 1997 and picked up the car the same day.
Rankine testified that at approximately 4 o'clock p.m. on August 6, 1997, while she was babysitting, appellant called her and told her that a wheel had come off the car while he was driving it. Appellant asked Rankine to call a towing service. Appellant and Rocky subsequently arrived at the house where Rankine was babysitting. According to Rankine, appellant asked her to take a child to his mother as a favor for Rocky so that Rocky and appellant could go to buy parts for the car. When Rankine agreed, Rocky told her to deliver the child to a woman named Marilyn, who was in either Room 312 or 321 at the North Point Inn.
According to Rankine, when she and appellant got in Rocky's car, she saw a child sleeping in the car. Rocky then took her to the Greyhound bus station, where he gave her $40 for cab fare to the North Point Inn, a bag of clothes for the child and a wad of money to give to the child's mother. Rocky told Rankine to tell the child's mother that "Tony sent me."
Rankine testified that she and the boy took a cab to the North Point Inn. According to Rankine, she took the boy to the room that Rocky had instructed her to go to and gave the child and the money to Lysius, who then asked Rankine to give the floral suitcase to Tony. Rankine testified that as she was rolling the suitcase out of the elevator, she was "attacked" by the police officers.
After the jury was charged and began deliberating, they presented a list of eight questions to the trial court. Instead of putting the questions on the record and answering them, the trial judge instructed the jury that "[W]e're not here to answer your questions. You must decide this case based upon the evidence that has been presented to you at this point. I believe that there is sufficient evidence for you to arrive at a verdict in this case." The trial judge then told the jury, "I want this jury to decide this case," and sent them back for further deliberations.
The jury subsequently found appellant guilty of drug trafficking and found Rankine not guilty.
On December 18, 1997, appellant appeared for sentencing. The trial judge reminded appellant that if he had pled guilty before trial, he would have sentenced him to two years, but told him that because he would not plead, "you don't get the chance everybody was talking about * * *." The judge then sentenced appellant to five years in prison, the maximum sentence, and fined him $10,000.
Appellant timely appealed, assigning four assignments of error for our review:
 I. THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT IMPOSED A MAXIMUM SENTENCE OF IMPRISONMENT AGAINST THE APPELLANT, A FIRST-TIME OFFENDER, AND FAILED TO SPECIFICALLY FIND ON THE RECORD THAT THE SHORTEST SENTENCE WOULD DEMEAN THE SERIOUSNESS OF THE OFFENDER'S CONDUCT OR FAIL TO ADEQUATELY PROTECT SOCIETY FROM FUTURE CRIMES AND FURTHER, THE RECORD DOES NOT SUPPORT SUCH A SENTENCE.
 II. IMPROPER CONDUCT BY THE TRIAL COURT VIOLATED THE APPELLANT'S RIGHT TO A FAIR AND IMPARTIAL TRIAL AND DUE PROCESS OF LAW.
 III. THE TRIAL COURT ERRED WHEN IT UNDULY RESTRICTED THE APPELLANT'S RIGHT TO CONFRONT WITNESSES BY LIMITING CROSS EXAMINATION.
 IV. IMPROPER AND IRRELEVANT OPINION TESTIMONY ELICITED BY THE STATE AND ALLOWED OVER OBJECTION BY THE TRIAL COURT VIOLATED THE APPELLANT'S RIGHT TO A FAIR AND IMPARTIAL TRIAL AND DUE PROCESS OF LAW.
In his second assignment of error, appellant argues that the trial court's actions and comments throughout the trial prejudiced his right to a fair and impartial trial. Because this assignment of error is dispositive, we consider it first.
The judiciary must retain detached and neutral in any proceeding before it. State v. Bayer (1995), 102 Ohio App.3d 172,174. Although there is no absolute prohibition to preclude a judge from commenting during a trial, the judge must bear in mind that his or her influence on the jury can be, and properly is, of great weight. State v. Thomas (1973), 36 Ohio St.2d 68, 71. Juries are highly sensitive to every remark made by the trial judge, who is the ultimate authority in the courtroom. Id.
Where a trial judge asks questions or makes statements in the course of a criminal trial within the hearing of the jury, the questions or comments may be construed as an expression of opinion on the part of the judge concerning the credibility of a defendant or a witness, or his or her opinion as to the facts of the case. Prejudicial error may result when the jury believes that the trial judge has an opinion in the case. State v. Kay
(1967), 12 Ohio App.2d 38, 49. Thus, in a jury trial, "the court's participation by questioning or comment must be scrupulously limited, lest the court consciously or unconsciously indicate to the jury its opinion on the evidence or on the credibility of a witness." State, ex rel. Wise v. Chand (1970),21 Ohio St.2d 113, paragraph three of the syllabus.
The test for the propriety of the trial judge's participation in the trial is whether the interruptions, comments, or questions by the judge interfered with the defendant's constitutional right to a fair trial. Thomas, 36 Ohio St.2d at 71; State v. Lawrence
(1954), 162 Ohio St. 412. In State v. Wade (1978), 53 Ohio St.2d 182,188, the Ohio Supreme Court set forth five factors for reviewing courts to consider in determining whether a trial judge's actions and remarks were prejudicial:
 1) the burden of proof is placed upon the defendant to demonstrate prejudice; 2) it is presumed that the trial judge is in the best position to decide when a breach is committed and what corrective measures are called for; 3) the remarks are to be considered in light of the circumstances under which they are made; 4) consideration is to be given to their possible effect upon the jury; and 5) to their possible impairment of the effectiveness of counsel.
Considering the trial judge's actions and comments in light of these factors, we conclude that the judge's actions and comments throughout the trial demonstrated an obvious bias against appellant that violated his right to a fair and impartial trial.
The trial judge's bias against appellant was evident even before the trial started, when the judge informed appellant that if he pled guilty, he would be sentenced to eighteen months in prison, but if he went to trial and was found guilty, the judge would sentence him to five years. It is axiomatic that "a defendant is guaranteed the right to a trial and should never be punished for exercising that right." State v. O'Dell (1989),45 Ohio St.3d 140, 147. Thus, the augmentation of a sentence based upon a defendant's decision to stand on his right to put the government to its proof, rather than plead guilty, is improper.State v. Scalf (Mar. 5, 1998), Cuyahoga App. No. 71910, unreported. Indeed, we have cautioned the lower court before about making comments that demonstrate an improper intent to punish the accused for going to trial. State v. Williams (Oct. 19, 1995). Cuyahoga App. No. 67970, unreported; State v. Paige
(Dec. 22, 1994), Cuyahoga App. No. 66743, unreported. Nevertheless, the trial judge stated unequivocally that he would punish appellant by increasing his sentence if appellant exercised his constitutional right to go to trial. Indeed, at sentencing, the trial judge reminded appellant that he was being sentenced to five years because he would not plead guilty. Although the jury did not hear these colloquies between the trial judge and appellant, they are indicative of the trial judge's bias against appellant.
The trial judge's bias against appellant was also apparent throughout the trial. First, the trial judge improperly vouched for the credibility of the state's witnesses. On cross-examination of Sergeant Patton, Rankine's counsel attempted to clarify whether Rankine actually threw the suitcase at Patton or merely pushed it out of the elevator at him. After repeated questioning, the trial judge suggested that Patton demonstrate what happened. Patton testified:
 When the elevator door opened up, we were about this far apart now. I'm standing out in the hallway. I say to her, "Police. You're under arrest." At this time, she gives it one of these and runs down the hall. I'm behind her, grabbing her. There's like two steps right here that go up to a doorway.
 As I'm going up to the doorway with her, the lieutenant is coming down, and she comes through that door and hits me and she gets through the door as it opens. She makes it about another few feet over here. In the meantime, there's policemen touching her all the time. When she got down to this area, she was handcuffed and placed under arrest.
In an apparent reference to Patton's testimony in the first trial, Rankine's counsel then told Patton, "Okay. Thank you. You got it right this time." The prosecutor objected. After threatening Rankine's counsel with contempt, the trial judge improperly informed the jury that Patton's testimony was credible:
 Counsel, that was clearly an inappropriate comment. Any more of that and you're going to be found in contempt. He didn't get it right this time. He's been consistent every time he testified. If you want to start making comments like that, I'm going to call this jury's attention to the fact that he's been completely consistent. So no more comments like that.
Later, the trial judge improperly vouched for the credibility of all of the law enforcement officers who testified during the trial. During closing argument, Rankine's defense counsel argued that appellant and Rankine had unwittingly assisted James Guy in retrieving the suitcase containing the drugs from Lysius. Defense counsel stated:
 [I] don't think it's going to take you too much time to figure this mess out — I think probably you've already come a long way in doing that. But if you listen to the tapes, it's Marilyn and James Guy. James Guy has made $21,000. He's a businessman, like Detective Hill, who —
The prosecutor objected and the trial judge called for a sidebar. Subsequently, the judge sustained the state's objection and then told the jury:
 Ladies and gentlemen, the Court is going to strike a portion of that closing argument. Any effort to impugn the police officers, the FBI officers, or members of the law enforcement community who participated in this case is offensive to the Court, and I will not permit it.
Such vouching by the trial judge for the credibility of the state's witnesses is clearly improper. Defense counsel is entitled to comment upon the law enforcement officers' abilities, investigation and any other aspect of their testimony as it relates to the case. Moreover, police officers do not hold any special status as witnesses. Indeed, the court is authorized to instruct the jury that a police officer's testimony is no more or less reliable than any other testimony. Clearly, by vouching for the credibility of the state's witnesses, not once but several times, the trial judge abandoned his role as an impartial magistrate and indicated to the jury his opinion regarding the credibility of the state's witnesses as opposed to those put on by the defense.
The trial judge also communicated his opinion of the case to the jury by refusing to answer the jury's questions after they began deliberating and instructing them that "I believe that there is sufficient evidence for you to arrive at a verdict in this case." We believe that the jury could reasonably conclude from this comment that the judge thought the jury should find appellant and Rankine guilty.
The trial judge also communicated his bias against appellant and his co-defendant to the jury by repeatedly reprimanding, interrupting and admonishing defense counsel in front of the jury. For example, although there was no objection before the court, the trial judge interrupted Rankine's counsel during her cross-examination of Sergeant Patton and told her: "Counsel, we have been through this. We saw the demonstration. I'm going to strike the question. Let's move on to something relevant we haven't heard before." Similarly, when Rankine's counsel was cross-examining Sergeant Baumiller, although there again was no objection before the court, the trial judge interrupted counsel and told her that she was being repetitive. The judge also admonished counsel that "time's awasting." A few moments later, the trial judge interrupted counsel in mid-sentence to announce a recess.
Later, on her direct examination of her own witness, the trial judge told counsel to "speed this along, or this jury is going to be here the next week." Also during the direct examination of her own witness, although there again was no objection before the court, the trial judge determined that the answer to counsel's question was irrelevant and instructed the witness to not answer the question. On other occasions, the trial judge reprimanded defense counsel for eliciting hearsay testimony and for asking leading questions.
This court finds that the cumulative effect of the trial court's actions and comments prejudiced appellant and denied him a fair trial. Moreover, we note that actions and comments such as these are, at best, inappropriate and inconsistent with the spirit and intent of Canons 3 (B) (4) and 3 (B) (5) of the Code of Judicial Conduct. These sections provide:
 A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity * * *.
 A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by word or conduct manifest bias or prejudice * * *.
The commentary to these sections provides:
 The duty to hear all proceedings fairly and with patience is not inconsistent with the duty to dispose promptly of the business of the court. Judges can be efficient and businesslike while being patient and deliberate.
 A judge must refrain from speech, gestures or other conduct that could reasonably be perceived as bias or prejudice * * *.
Appellant's second assignment of error is therefore sustained. Appellant's conviction is reversed and the case is remanded to the common pleas court for a new trial.
Having reversed appellant's conviction on appellant's second assignment of error, we overrule appellant's first, third and fourth assignments of error as moot. See App.R. 12 (A) (1) (c). Appellee's motion to supplement the transcript is overruled as moot.
This cause is reversed and remanded for further proceedings consistent with the opinion herein.
It is, therefore, ordered that appellant recover from appellee his costs herein.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
KARPINSKI, P.J. and ROCCO, J., CONCUR.
 ________________________________ TIMOTHY E. McMONAGLE JUDGE